# COURT OF ERRORS AND APPEALS.

## JUNE TERM.

## 1871.

JOHN P. REZNOR and WILLIAM WILDS, Sheriff, respondent below, Appellants, *v.* CHARLES F. MACLARY, Complainant below, Appellee.

Part payment of a debt is not a sufficient consideration to support an executory promise to discharge the debtor, and where there is an agreement to release a debt on the part payment of it still remaining *in fieri*, the defence of want of a valid consideration for it, will be available. But a release under seal complete in its terms, and duly executed, needs no consideration to support it beyond what the seal imports. It will be effectual, even, if it be wholly gratuitous and without the payment of one cent by the debtor.

False and fraudulent misrepresentations, or concealment of material facts, unless they appear to have induced the party creditor to compound and release the whole debt upon the payment of a part of it, will not invalidate or avoid an executed release of it. But where the debt consists of a judgment recovered in an action recently instituted on which an execution has been issued and levied to the full amount of it, if the creditor be guilty of negligence in compromising it without consulting his attorney who was cognizant of the levy, as to the condition and security of the claim, false and fraudulent misrepresentations made by the debtor before the compromise, of his inability to pay the whole debt, and his concealment from the knowledge of the creditor of the fact well known to him, that the execution had been levied on his goods, and that they were sufficient to pay the whole amount of it, will not avoid an executed release of the entire debt made in consideration of the payment of a part of it.

ON appeal from the decree of the chancellor sitting in

31

and for Kent County, before Gilpin C. J. and Wootten, Houston and Wales, Associate Judges.

The bill of Maclary alleged that he and one Frederick W. Ridgely and Reznor had formed a mercantile copartnership of equal interests under the name and style of Ridgely & Maclary, and had commenced business at Ridgely Station on the line of the Maryland and Delaware Railroad in Caroline County, Maryland, in the summer of the year 1867, and that in the month of October following Reznor sold his interest in the firm to him and Ridgely and retired from it. That the two then formed a new partnership and continued in the business under the same name as a firm, and made and delivered to Reznor for a part of the price agreed to be paid him for his interest in it, two promissory notes dated October 21st 1871, one for $500 payable to his order in four months, and the other for $1000, payable in like manner in eight months, at his office, No. 335 South Sixth Street, Philadelphia. And that early in August 1868, he, Maclary, sold out his interest in the firm to one James S. Dungan who continued the business under the name and style of Ridgely & Dungan, and that it was then expressly stipulated and understood that the last mentioned firm should assume and pay all the outstanding liabilities of the firm of Ridgely & Maclary, including the said notes to Reznor; and, therefore, he afterward gave himself no concern about them, and heard nothing of them until sometime in the spring of 1869, when he received a telegram from Reznor to the effect, that it would be greatly to his (Maclary's) interest to see him (Reznor) immediately, and that he went the same day to Philadelphia to see him, when Reznor informed him that he had sent for him to come and see him about the notes, that they had not been paid, that he looked to him for the payment of them, and was willing under the circumstances to accept from him the sum of one thousand dollars in payment of them, to which he replied that he considered the offer a very liberal one, but that he wished to wait until the affairs of the firm of

Ridgely & Dungan should be closed and settled, to which he, Reznor, made no objection, but said he was willing to accept the sum of one thousand dollars in settlement and payment of the two notes. That the firm of Ridgely & Dungan continued in business until the 1st day of January 1869, when it became totally bankrupt and insolvent and unable to meet its engagements with reference to the payment of the notes : and that Ridgely, one of the members of it, had died a short time before the conversation above stated between the complainant and Reznor.

And further, that Reznor without awaiting the settlement of the affairs of the firm of Ridgely & Dungan, and without giving him any notice of his intention to bring suit, on the 23rd day of October 1869, issued out of the Superior Court in and for Kent County, a writ of summons, and having filed his affidavit and copies of the notes, obtained judgment thereon against him in that court, at the October Term in that year, for the sum of $1633 damages, and $13.89 costs of suit, and after the adjournment of the court caused to be issued out of it in execution of the judgment on the 3rd day of November following and to be delivered to William Wilds, Sheriff of the County, a writ of *fieri facias*, returnable to the April Term 1870 of the court, which was then in his hands to be executed by him. That on the eighth day of that month he went to Philadelphia to see Reznor, and then said to him that he had called on him to see what arrangement could be made for the settlement of the notes, to which he replied that he was still willing to settle in the manner proposed in the preceding spring, and would take one thousand dollars in full settlement of them. He then gave him a check on the Bank of Smyrna for $200, and told him, if he would come down to Clayton where he resided, the next day, he would settle the matter, but he did not come down until the second day after that, when they made a complete settlement by his then giving him another check on the same Bank for $300, both of which were duly honored and paid to him, and also his judgment

note under seal at four months for $500 and interest, and which were accepted by him in full satisfaction of the notes and the judgment thereon, upon his paying in addition thereto, the costs and his attorney's fees in the suit, and that he then signed, sealed and delivered to him the following receipt and release :

" CLAYTON, DELAWARE, November 10th, 1869.

Received of Chas. F. Maclary five hundred dollars in cash, which with his judgment note at four months, for five hundred dollars is in full and complete settlement and payment of a judgment in the Superior Court of the State of Delaware in and for Kent County, at my suit against Frederick W. Ridgely and the said Chas. F. Maclary, the same being No. 149 of the continuances to the October Term A. D. 1869 of said Court; and I do hereby expressly release, exonerate, acquit and discharge the said Charles F. Maclary of and from all further liability thereon, he paying costs in the above case, and attorney's fees."

Signed J. P. Reznor, and sealed as above mentioned.

That he had since paid the costs to the sheriff, and prior to filing his bill of complaint, had duly tendered to the attorney for the plaintiff in the suit seventy five dollars, the amount of his fee agreed upon between them, which he had declined and refused to accept, and which amount he had thereupon deposited in the hands of the Register in Chancery subject to the order of that Court. That the writ of *fieri facias* still remained in the hands of the sheriff, who by the instructions of Reznor, through his attorney, was proceeding with the execution of it against him, contrary to the said agreement, settlement and release of the said judgment, most wrongfully and unjustly and contrary to equity and good conscience, to the great injustice, detriment and injury of the complainant, unless restrained by the injunction of that court. The prayer of the bill was, therefore, for a preliminary, and also a perpetual injunction restraining the sheriff, Reznor and his attorney from

proceeding further in the execution of the judgment and writ against him.

The answer of the respondent admitted the facts alleged in the bill, but denied that he was a party, or was privy to, or was in any manner bound by the agreement between the complainant and the firm of Ridgely & Duncan to pay the notes ; that he could well believe, as was alleged by the complainant, that after that until the time stated by him, he gave himself no concern about them, and knew nothing concerning them, although he, Maclary, well knew, and ought to have known in the mean while that they had not been paid, and one reason why he had heard during that time nothing concerning them was that he did not know where the complainant was, and had been informed that he and his partner, the makers of them, had failed and were insolvent, which made him more lax in looking after and endeavoring to collect them than he otherwise would have been. But in view of these circumstances, and after having learnt by the information of others that he was then at Clayton, he telegraphed him on the 3rd of April last, as stated in the bill of complaint, and in pursuance of it the complainant called upon him at his residence in Philadelphia, when he offered to take one thousand dollars in cash in settlement of them ; but the offer was wholly voluntary on his part and without the least consideration moving from the complainant, and was made in view of the information before mentioned, that he, as well as the other maker, had failed and become insolvent, and even if such was not the case, that he might have been put to considerable expense and delay in collecting the notes, with all the attendant risks. It was true, he did say that the offer was a very liberal one, but he did not accept, or offer to accept, or show any disposition to accept it; on the contrary, he declined and refused to accept it until the affairs of Ridgely & Dungan should be wound up, about which he then knew nothing, and over which he had no control, as the complainant well knew. But the offer was made for prompt payment, and not for

future acceptance, after the affairs of that firm should be wound up, and was so fully understood to be by him at the time when it was made. He did not, however, say, or even intimate that he would then be willing to accept it, but only said he wished to wait till they were wound up, which he, the respondent, regarded as a mere evasion and excuse for not settling at all, and, therefore, he pressed the matter no further. But he did not assent to the proposed delay, or say, or in any manner intimate, that he had no objection to it, for he had no thought of assenting to it. Nor could the complainant have understood him to make no objection to it, as was apparent from a letter which he received from him, written on the 23d day of October, 1869, which was as follows :

"CLAYTON, DELAWARE, Oct 23d, 1869.

Judge, J. P. Reznor, Philadelphia, Pa.

Dear Sir : Being absent from home has caused the delay in reply to your letter which is now before me. As you persist in having the money on those notes immediately, I can only say to you that to cancel those notes I will make to you a full and perfect title to those lots at Ridgely which is the only property I own in this world, or if you prefer I will give you one hundred dollars in cash. You may choose between the two, which is the best I can do. Hoping soon to hear from you, I remain,

Respectfully yours,

C. F. MACLARY.

P. S.—You could hold those lots, or you could sell them for more than one hundred dollars. I was offered that. Yours, Maclary."

He did not know, and, therefore, could not answer how long the firm of Ridgely & Dungan had been, or when they become insolvent, or whether they were able to pay the notes, or when Ridgely, the first named member of it died, nor could he see what pertinency they had to the subject matter of the complaint, whether the allegations

contained in the bill in that respect were true or false. He, therefore, knew of no reason why he should await the settlement of their partnership affairs, as he had no interest therein, or knowledge thereof, nor of any reason why he should give the complainant any notice of his intention to put the notes in suit, as he had repeatedly declined and refused to pay them, and thus left him no alternative but to sue or lose the debt. That the day following the issuing of the execution on the judgment recovered by him on the notes against the complainant as stated in the bill of complaint, the sheriff, pursuant to the instructions of his attorney and the exigency of his writ, went to his place of business in Clayton, and levied upon his store and stock of goods mentioned in the levy, and informed him that he would have to close the store unless satisfactory security to the amount of the debt was given for the forthcoming of them on the day of sale under the writ, but on that being done, he would be allowed to retain the possession and disposition of them as before, and which was afterward given by his bond in the amount of the execution with his father, John Maclary, as surety therein, and who was good and ample security for that amount. But he, the respondent, at that time, and for a long time thereafter, did not even know that an execution had been issued, or any lien had been obtained upon the complainant's real or personal estate, or that he was the owner of any estate whatever, although his goods then levied on under the writ were worth twenty five hundred dollars.

A few days before, however, he had fully completed the giving of the security to the sheriff on the execution for the forthcoming of the goods levied on, but after his father had consented to become his surety, and the time had been appointed to meet the sheriff at Dover to formally consummate it, the complainant on or about the 8th day of November 1869, visited him again in Philadelphia, and said that he had come to see if he could settle those notes, and stating as he had often done before, that he had no property of his own, but that he now had a friend who would help

him, if he could get an abatement of the amount and
indulgence in time, and unless he could get that he was
not able to pay, and could not pay, or be compelled to pay
any thing ; but that he never even mentioned, or alluded
to the fact that a judgment had been obtained against him
on the notes, or that any execution had been issued
thereon, or that any levy had been made upon it; on the
contrary, he studiously and fraudulently concealed the
knowledge of these facts entirely from him. That reposing
full faith and credit in the false and fraudulent misrepre-
sentations of the complainant, and full trust and confidence
in his supposed honesty, fair dealing and veracity, and not
for a moment doubting or suspecting the truth of his state-
ments, and urged thereto by his pretended haste and hurry
that it was necessary for him to return home by the next
train, he hastily, ignorantly and unadvisedly consented to
the reduction and abatement of his just demands, and to the
manner of payment as hereafter stated, and also to visit
Clayton on the day mentioned in the bill of complaint,
and thereupon received from him his said check for $200,
and in pursuance of the understanding and appointment
visited Clayton and signed a paper which the complainant
had prepared and presented to him for his signature, but
whether the copy of it set forth in the bill of complaint
was a correct copy he could not say for certainty, as he did
not examine it very carefully, or fix the contents of it in
his mind, and he took no copy of it. That he was not at
Clayton exceeding an hour and a half on that occasion,
and that all the business was transacted between them in that
brief time, and without any advice of counsel on his part,
and that he then and there received from him the other
check for $300, as mentioned in the bill of complaint, and that
both had been paid to him, and also his judgment note at
four months for $500 with interest, as therein stated; but
out of the amount received on the checks, he had to pay
his attorney the sum of seventy-five dollars as his fee in
the suit mentioned, while the last note referred to was with-
out any revenue stamp upon it, which rendered it invalid,

if not worthless, and was indorsed by the same person who witnessed it; and that although the complainant was informed of those imperfections immediately on his return from Clayton by letter, and requested to correct and perfect the same, he had hitherto altogether declined to do so.

The answer further alleged, as indicating a deliberate design on the part of the complainant to deceive and defraud the respondent in the transaction, that after his return from Clayton he wrote a letter to him requesting information on several points, and a copy of the receipt or settlement which he had signed, but instead of giving the information desired, he sent him only a simulated copy of the receipt with the very material alteration of the capital letter "I" inserted in the last line of it immediately preceding the words, "attorney fee," and making it read, instead of "he," the complainant, "paying costs in the above case and attorney fee," "he paying costs in the above case and I attorney fee," and as proof that the alteration was intentional and not accidental, he never offered to pay it until it was formally tendered to his attorney on the day, and only an hour before his bill of complaint was filed, and after he had absolutely repudiated and refused to abide by the fraudulent settlement and imposition practiced upon him, as he well knew. And in conclusion, as further evidence of the bad faith of the complainant, and of the false and fraudulent misrepresentations made by him in the matter by which he had purposely misled and entrapped him into such a settlement, the answer set forth copies of several other letters received by him from the complainant between the 12th of October and the 6th of November 1869, professing an earnest desire, but asserting his utter inability to pay the notes, and expressly stating, among other things, in one addressed to him on the 2nd of November 1869, in the following words: "I own nothing only as I wrote you some time ago. I have sold my store some time since, but to satisfy you I would be willing to pay you what I can afford," and even when he visited Clayton on the 10th of that month,

32

he again assured him that he was worth nothing and had no property or money with which to pay the demands, and again affirmed that he had sold his store. But on no occasion, nor in any one of his letters did he make any mention whatever of the suit instituted on the notes, or of the judgment recovered upon them, or of the execution issued upon it, or the levy thereon, or the slightest reference or allusion to anything of the kind; nor had he until after the date last mentioned, and after the settlement had been made and the receipt given, received any information or advice whatever from his attorney concerning them.

BATES, CHANCELLOR, read his opinion announced in the case below.

This case draws into question the validity of a release under seal by the defendant, Reznor, of a judgment held by him against the complainant, Maclary for $1633.33, recovered in the Superior Court at the Oct. T. 1869.

That the release was executed and delivered, and is in due form, is not disputed; but the defendant insists that it is invalid upon two grounds; (1) that it was without consideration; and (2) that it was obtained by fraudulent misrepresentation.

The first of these grounds of defence, viz; the want of consideration, has been heretofore argued and disposed of upon the motion made to dissolve the injunction for want of equity in the bill. Part payment of a debt is not a sufficient consideration to support an executory promise to discharge the debtor, and were this the case of an agreement to release remaining still *in fieri*, the defence of want of a valid consideration would be available. But this being a release under seal, complete in its terms and duly executed, it needs no consideration to support it beyond what the seal imports. It would be effectual even, had it been wholly gratuitous and without payment of one cent by the debtor. This point is more fully stated and the authorities cited in the opinion given upon the motion to dissolve.

The other defence, and the one mainly relied upon at the hearing, was fraud in obtaining the release. And the fraud was alleged to have been twofold, viz; misrepresentation by Maclary as to his means of payment, and the concealment by him of the fact that an execution had been levied to an amount sufficient for the whole debt. These two charges admit of separate consideration.

1st. As to the alleged fraudulent misrepresentations. The facts material to this point are these. The notes of Ridgely and Maclary upon which the judgment was recovered, being one for $500, at 4 months, the other for $1000, at 8 months, both dated Oct. 21, 1867, matured,the former in Feb. 1868, the latter in June of that year. Reznor took no steps toward their collection until the 3rd of April 1869, when by a telegram he invited Maclary to visit him in Philadelphia, with a view to a settlement. His inattention to the notes until that date is explained in his answer by the fact that he had been informed and supposed that both Ridgely and Maclary were insolvent, and further that he did not know where Maclary then resided, the latter having left Maryland, in which state Reznor had last known him; that being about this time informed that Maclary was residing at Clayton in this State, he sent the telegram with a view to obtaining some settlement of the notes. Maclary promptly responded by calling on Reznor in Philadelphia, and thereupon Reznor voluntarily offered to take $1000 cash, in full settlement. This offer, as the answer shows, was not induced by any representations then made by Maclary as to his means, nor even by any solicitation on his part. It was made, as Reznor states, in view of the information he had previously received that Ridgely and Maclary were insolvent, and also upon his considering that even if they were not wholly insolvent, he might be put to expense, delay and risk in the collection. So being anxious to stimulate Maclary to prompt effort, and to save something without further delay or risk, he proposed to accept the $1000 in full, intending thereby to make a liberal and tempting offer. Maclary,

however, did not then accede to it. Whether, as he alleges, the offer remained a standing one subject to his further consideration, or whether, as the defendant insists, it was then rejected and withdrawn, is not material. There was no further negotiation until October 1869, when some correspondence ensued, caused doubtless by the institution of the suit, but resulting in nothing. Soon after a judgment being recovered, execution was issued and levied Nov. 3rd 1869, upon a stock of merchandize valued at $2500, in Maclary's possession at Clayton, where he was in business as a merchant. The levy quickened Maclary's diligence, for having induced the Sheriff to defer closing the store until the 9th of November, by undertaking in the meantime to give security for the forthcoming of the goods, he repaired to Philadelphia on the 8th of November, and in an interview then held with Reznor, the latter again assented to accept $1000, with the costs and his attorney's fee, in full discharge of the judgment. Whether his proposal to do so was, as before, voluntary, or whether induced by any representations on the part of Maclary made during that interview does not appear, nor is this material. A check was given by Maclary for $200, and a meeting appointed at Clayton on the 10th of November, to carry out the settlement. On the day appointed, Reznor attended at Clayton, where he received another check for $300, and a note under seal at 4 months for $500, making up the $1000 to be paid, and thereupon the release was executed.

Now, the fraudulent misrepresentations relied upon as avoiding the release are contained in two letters from Maclary, dated respectively Oct. 23d and Nov. 2d, written shortly prior to the settlement. In the letter of Oct. 23rd he writes, "As you persist in having the money on those notes immediately, I can only say to you that to cancel those notes I will make to you a full and perfect title to those lots at Ridgely, which is the only property I own in this world, or, if you prefer, I will give you one hundred ($100) dollars in cash. You may choose between

the two, which is the best I can do." He adds in a P. S., "You could hold those lots, or you could sell them for more than one hundred dollars, as you choose; I was offered that." In the letter of Nov. 2d, writing of his desire to compromise, he says, "I own nothing only as I wrote you sometime ago. I have sold my store sometime since, &c.

These representations were false, for Maclary at the time of writing these letters, was still merchandizing, and held a stock of goods valued at $2500, which had not, so far as any evidence shows, been sold by him, as was stated in his letter of the 2d of November, but were on the next day, 3d of November, levied on as his goods, and he gave a forthcoming bond for them.

Nevertheless, I am of opinion that these false representations do not, under the circumstances, avoid the release; and this for two reasons. In the first place, it does not appear that it was by Maclary's statements that Reznor was induced to compromise the debt. His original offer, in April 1869, to accept $1000, in settlement, was made as the answer itself shows, under no inducement proceeding from Maclary, but was prompted by Reznor's own distrust of the debt and his anxiety to avoid trouble, caused by rumors of the insolvency of Ridgely and Maclary. This belief of the insecurity of the debt, and his willingness to settle at $1000, continued to possess his mind; nor can I see that the representations in Maclary's letters made any impression upon him. The same distrust and anxiety for a settlement which prompted his first offer to accept $1000, was the continuing inducement to accept it at the last, and would have led to precisely the same result had Maclary written nothing about his means. But the other, and perhaps, upon the facts a less questionable ground for sustaining the release, arises out of Reznor's negligence in compromising the debt without inquiry of his attorney, who was cognizant of the levy, as to the condition and security of the claim. The most ordinary diligence in this respect would have brought full information of the levy.

The rule of law as to the effect of false representations is a clear and settled one. In order to avoid a transaction on account of them, three things are requisite. 1st, The misrepresentation must relate to something material and substantial. 2d, The transaction sought to be avoided, must appear to have been induced by it. The party aggrieved must have been actually misled by it : and 3rd, His confidence must have been a reasonable one; as where the matters misrepresented are such as from their nature rest peculiarly in the knowledge of the party making the statement, or where there are fiduciary relations between the parties to warrant the trust reposed; or where the party misled is of such weak mental capacity as to be exempt from the requirement of ordinary diligence. Except in these cases, even betrayed confidence is not a ground of relief. Where no confidential relation exists, nor mental incapacity, and the means of information are open to both parties, a diligent use of which would have prevented the injury, Equity will not interfere. *Vigilantibus non dormientibus leges subveniunt.* 1 *Sto. Eq. Jur. Sec.* 191.

2d. The other circumstance of fraud relied upon as avoiding the release is that Maclary, pending the negotiation, did not disclose the fact that an execution had been levied on his goods to the full amount of the debt. But to this the obvious and conclusive answer is, that he was under no obligation to communicate these proceedings to Reznor. They were proceedings had under Reznor's own process, directed by his attorney, and with respect to which it was his duty to seek information from his attorney. He was not warranted to rely, and in fact did not rely, upon Maclary. The duty of disclosing facts which may influence the adverse party to a transaction, springs either from some fiduciary relation between the parties, or from a trust understood to be reposed by one in the other about a matter of which the latter has peculiar means of information. But these parties were dealing at arms' length, and the fact not communicated, to wit; the levy of the execution, was equally ascertainable by both. "The true definition

"says Justice Story," of undue concealment, which amounts to fraud in the sense of a Court of Equity, and for which it will grant relief, is the non-disclosure of those facts and circumstances which one party is under some legal or equitable obligation to communicate to the other, and which the latter has a right not merely in *foro conscientiæ* but *juris et de jure* to know. 1 *Sto. Eq. Jur. Sec.* 207. 2 *Kent. Com.* 482, and *note (a)*, 5*th Ed'n.*

Were this the case of a mere agreement to discharge the judgment remaining still unexecuted, a Court of Equity might, considering the advantage gained to be an unconscientious one, refuse to enforce it upon a bill for specific performance; but the release having been executed, and being such as, under the circumstances, the court would not on a cross bill avoid, I feel obliged to give to it its legal effect.

*Fulton*, for the appellant. He would in the first place remark that it was evidently most unreasonable to suppose that any creditor would consent to accept one thousand dollars in full satisfaction of a debt of sixteen hundred dollars, unless it was under a gross misapprehension of the actual ability of the debtor to pay the whole of it. But it was too clear and manifest in this case to be controverted or denied, even, on the other side, that Reznor was solely induced by the false and fraudulent misrepresentations of Maclary as to his ability to pay it in full, and by his fraudulent concealment of the fact, that the speedy and entire payment of it had been absolutely secured by the recovery of the judgment on the notes and the levy of the execution upon his goods, to assent to such a composition of his claims against him.

His first objection to the decree, however, was that the Chancellor had erred in treating the complainant in the case below as virtually the respondent in it, and giving him all the advantages of that position, instead of holding him to the strict rule applicable to a complainant, which he in fact was in that court. He also erred in considering

the settlement an executed, and not an executory contract between the parties, which it in truth was in the proper sense of that term ; for although the release was signed, sealed, executed and delivered by Reznor to Maclary on the 10th of November 1869, the contract itself under which it was made and entered into by them, remained *in fieri*, inasmuch as it was one entire contract and by the terms of it the costs of the suit upon the notes and the attorney's fee were to be paid afterward.  And being an executory, and not an executed contract, it was competent for the respondent in such case to show that there was no valid consideration received by him for it, and, therefore, it was a mere nullity, so far as the equity of the bill was concerned.   *Whart. Law Lex.* 208. 1 *Bouv. Law Dic.* 494. *Lovelace v Cockett, Hob.* 165. *Geaug v. Swaine,* 1 *Ludw.* 165. But even, if the release in this case constituted an executed contract, the facts proved, and particularly the letters from Maclary to Reznor, reiterating over and over again, his false and fraudulent assertion that he was utterly unable to pay over one hundred dollars on the notes, that he had no money and no property, except the lots at Ridgely valued at that sum, and that he had sold his store at Clayton, clearly showed by what repeated and systematic misrepresentations he had prevailed upon Reznor to accept the terms of the settlement, and which would avoid it.   With the information which he had before received of his failure and insolvency, and without reposing any undue confidence in his honesty and veracity up to the time of that transaction, and the fraudulent developments which so soon afterward followed it, it was reasonable for him to credit such apparently frank and truthful declarations, so often repeated and re-affirmed in such a manner to him.   But where a misrepresentation calculated to mislead a party is made to him, and upon the faith of which he acts, it is fraudulent and fatal, and even a conveyance obtained by it, will be set aside. *Spry v. Raynell,* 13 *E. L. & E. R.* 74.   And could any one suppose that the appellant, after the recovery of the judgment upon the notes

and the issue and levy of the execution on the goods of Maclary to the full amount of the entire debt and costs, would have assented to such an abatement of it, but for the artful and studied concealment of all knowledge or information in relation to them from him by the latter? The advantage which he thus took of him at the last moment, and the speed and haste with which he hurried it up, after having for months before cajoled, cheated and deceived him with false representations of his utter inability to pay any such amount, was a gross imposition and fraud practiced upon him, to which a parallel in point of· cunning and cool calculation, artifice and deceit, could scarcely be found to have ever been subjected to the investigation and redress of a Court of Equity. 1 *Sto. Eq. Jur.* *Secs.* 206, 191, 222. *Martin v. Morgan*, 5 *E. C. L. R.* 87. *Lewis v. Gamage*, 1 *Pick.* 346. *Hunt v. Moore*, 2 *Barr* 107. 1 *Pr. Wms.* 239.

*Massey*, for the respondent. He was ready to admit the law as stated by the counsel on the other side, but the contract in this case was an executed, and not an executory contract. By it the judgment was satisfied, and Maclary was discharged and released from all liability under it. The first important fact in the case was the telegram from Reznor to him in the spring of 1869, and the object of it, which was the settlement of the notes. Maclary at once repaired to Philadelphia, and without any previous communication between them on the subject, Reznor then proposed to him to take one thousand dollars in full satisfaction and payment of the two notes before any representation whatever had been made to him by Maclary, other than that he could not pay that, or any other amount upon them, but he would have to wait the winding up of Ridgely & Dungan's affairs. It was, therefore, evident whatever might have been the representations made to him, after that time by letter or otherwise, or whatever might have been the knowledge or information withheld from him by Maclary with regard to the judgment or the execution,

33

they could, of course, have had no effect to induce him to accept such a composition, because it was his own voluntary offer and proposition made at the time. But why had such particular stress been laid on the alleged concealment of the recovery of the judgment on the notes, by Maclary at the time when the settlement of it was made and the release of it was executed and delivered to him by Reznor ? There was no foundation in fact for such an allegation, for the judgment was expressly named and recited in the receipt and release which he had executed, and, therefore, all the pretences and allegations contained in his answer that the existence of it was on that or any other occasion studiously and fraudulently concealed from him by Maclary, could in turn be stigmatized with more truth and justice, as both false and fraudulent. But even, if that had not been the case, he was bound to know, and would be presumed both in law and equity to have known, that there was such a judgment, and particularly of a judgment recovered in his own favor ; and if he had not in point of fact known of it at that time, it would have been his own fault, and the fault of his attorney in the suit, and not the fault of his adversary in that as well as in this suit that he was not informed of it, whatever might have been his motive in such a case for withholding the information from him. So, of the execution and the levy upon it, for it was his own process, and he was bound to know of it.

The rules in equity as to fraudulent misrepresentation or concealment, were too familiar and well settled to admit of any dispute or misapprehension in regard to them. A misrepresentation being proved, the first rule is that it must appear to have been material, and that it did actually induce, deceive and mislead the party complaining of it, to his loss and injury in regard to the matter misrepresented. And a fraudulent concealment must be of something which the party withholding the information of it, was bound in equity and good conscience to make known to the other, but which he has not done to his like substantial detriment or injury. · *Adam's Equity* 397. 1 *Story's*

*Eq. Jur. Sec.* 191. But if Reznor was for any reason whatever entirely willing, and even anxious, to accept from Maclary alone after the failure and insolvency of the firm of which he was one of the members, one thousand dollars in full of his liability on the two notes, long before any of the alleged misrepresentations were made by him, and also long before the alleged concealment complained of as fraudulently practiced by him on Reznor, tried by the rules of equity which he had just stated, how could it be made to appear that he was in effect induced or misled by either of them, to his loss, or injury, if he made in the end no greater deduction in his demands after such alleged misrepresentations and concealment, than he was perfectly willing to make long before the occurrence of them? To his own apprehension the inconsistency of his subsequent dissatisfaction and eager demand for more money, was susceptible of but one explanation only, and that was that he had always been entirely content in his own mind, even up to time of the settlement and when it was made and concluded between them, to accept from Maclary one thousand dollars in full satisfaction of the notes, so far, at least, as he was concerned, and all the dissatisfaction which he had since experienced and exhibited on the subject was but a change of mind and the result of a subsequent discovery entirely, when he learnt as he very soon after did from his attorney, what a good opportunity he had just missed of making him pay the whole amount of both the notes.

*Fulton*, replied.

*Gilpin, C. J.*, announced the opinion of the court affirming the decree of the Chancellor. The contract of settlement between the parties of which the receipt and release was a part, was an executed contract for the purposes for which it was entered into, and so far as it pertained to the extinguishment of the notes and the judgment recovered upon them against the complainant. And besides, it does not appear from any thing disclosed in the bill and answer,

or in the facts proved or admitted in the case, even admitting all the misrepresentations made by him to Reznor, and the concealment of the judgment, execution and levy from his knowledge, to be all that they are alleged to have been by the respondent, that the latter was induced, or led by them to accept from Maclary one thousand dollars in full payment of the two promissory notes which he held against him and his former partner, Ridgely, amounting together to fifteen hundred dollars, because he had himself voluntarily offered in their first meeting together about the matter, and before any such misrepresentations had been made to him by Maclary, to settle them with him on that same basis. And it is but a matter of fair presumption to suppose upon all the facts disclosed in the case, that he continued of the same mind and disposition, and was ready and willing at any time afterward to settle them with him on that basis, until the settlement was so actually made between them on the 10th of November 1869, some six months after he had himself first proposed it to him. And we think this presumption is warranted by the fact that when he came to settle the notes with him on that basis that day, he required Maclary to pay, in addition to the one thousand dollars, his costs of suit on the notes and attorney's fee which had in the meantime been incurred by him on account of them. The decree in this case is, therefore, affirmed.